21IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

SUMMIT INVESTMENTS II, *et al.*,     )
     Plaintiffs,     )
     )
     v.     )
     )
SAM'S EAST, INC.,     )     Civil Action No. 3:23CV479 (RCY)
     Defendant and Third-Party Plaintiff,     )
     )
     v.     )
     )
TRW ENTERPRISES, INC.     )
     Third-Party Defendant.     )
————————————————————)

## MEMORANDUM OPINION

This matter comes before the Court on Defendant Sam's East, Inc.'s Motion to Dismiss (ECF No. 13). The motion has been fully briefed, and the Court dispenses with oral argument because the facts and legal contentions are adequately presented in the materials before the Court, and oral argument would not aid in the decisional process. E.D. Va. Loc. Civ. R. 7(J). For the reasons stated herein, the Court will grant-in-part and deny-in-part Defendant's Motion to Dismiss (ECF No. 13).

## I. BACKGROUND

When deciding a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court "accept[s] as true the plaintiff's well-pleaded allegations and views all facts and draws all reasonable inferences in the light most favorable to plaintiff." *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). Such a standard, however, does not require accepting any unreasonable inferences or plaintiff's legal conclusions. *Id.* Additionally, a court may consider any documents attached to the complaint. *E.I. du Pont de Nemours & Co. v. Kolon*

*Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011).  Applying these standards, the Court construes the facts in the Complaint, including any attached documents, as follows.

## A.  The Lease

Summit Investments II and Summit Investments V ("Plaintiffs" or "Summit") own, as tenants in common, a 650,250 square-foot industrial warehouse in Prince George, Virginia ("the Premises").  Compl. ¶¶ 3, 5; Compl. Ex. A ("Lease Agreement")[1] 10, ECF No. 2-1.[2]  Prior to the lease presently at issue, the Premises were new and had not yet been occupied.  Compl.  ¶ 8.

On July 1, 2022, Plaintiffs entered into a Lease Agreement (the "Lease") with Sam's East, Inc. ("Defendant" or "Sam's East") whereby Plaintiffs would lease the Premises to Defendant.[3] The Lease contains forty-six sections and sixteen exhibits.  *See generally* Lease Agreement.  The provisions of the Lease most relevant for present purposes come from the following sections: (1) "Use of Premises," (2) "Maintenance and Repairs," (3) "Indemnities, and (4) "Tenant Alterations and Additions; Tenant Improvement Allowance."  *See* Lease Agreement 24–27, 30–36, 45–46. These provisions are excerpted below:

---

[1] There is one amendment to the Lease Agreement dated July 29, 2022; however, the Lease Agreement and said amendment will be referred to collectively as the "Lease Agreement."  Compl. ¶ 5; *see* Lease Agreement 2–6.

[2] For this and all other filings, the Court utilizes the pagination assigned by the CM/ECF system and not the pagination appearing on the original document.

[3] The original Lease Agreement identified the "Tenant" as "Sam's West, Inc."  Lease Agreement 2.  The amendment to the Lease Agreement clarified that such identification was in error and instead specified that the Tenant was intended to be Sam's East, Inc.:

> References to "Tenant" in the Lease as "Sam's West, Inc." are in error and the parties hereto acknowledge and agree that the definition of "Tenant" is as stated in this Agreement.  Sam's East, Inc. hereby ratifies the Lease and agrees that it is bound by all terms and conditions of the Lease as of the Lease Date, in the same manner and to the same extent as though the correct tenant name had been reflected therein and as if the original tenant thereto.

Lease Agreement 2.  All references to the Lease throughout therefore refer to the amended version.

**Section 7.  Use of Premises**

\* \* \*

(d) Landlord acknowledges that Tenant intends to routinely operate within the Premises one (1) or more forklifts and/or stock pickers (e.g. Crown 6000 stock pickers (or its equivalent)) and such other stock pickers with size, weight, and operating specifications materially similar to the size, weight, and operating specifications of the Crown model 6000 stock pickers (or its equivalent) (collectively, the "Stock Pickers").  Landlord represents that each and every floor slab in the Premises is sufficient to accommodate Normal Usage of the Stock Pickers.  Normal Usage of the Stock Pickers shall include continuous operation of the Stock Pickers for their normal and intended purpose in their customary manner on a twenty-four (24) hour basis ("Normal Usage").  Nonetheless and notwithstanding anything to the contrary elsewhere in this Lease, Landlord shall only be responsible for repair of rocking floor panels.  All other repairs to the floors or floor slabs which are necessitated or caused by the Normal Usage of the Stock Pickers shall be the responsibility of the Tenant.

\* \* \*

**Section 10.  Maintenance and Repairs**

\* \* \*

(b) Subject to Tenant's self-management rights, as more fully described below, and except as to such maintenance and repairs as are the obligation of tenant pursuant to Section 10(a) of this Lease, Landlord shall be responsible for the prompt performance of the following at all times, in each case consistent with the standards of reasonable management, repair and replacement practices for Class A warehouse/distribution centers in the submarket in which the Premises are located:

\* \* \*

(iii) Landlord's obligations shall exclude the cost of any replacement, maintenance or repair required because of the act or negligence of Tenant or any of Tenant's subsidiaries or affiliates, or any of Tenant's or such subsidiaries' or affiliates' agents, contractors, employees, vendors, licensees or invitees (each, a "Tenant's Affiliate" and collectively, "Tenant's Affiliates"), the cost of which shall be the responsibility of Tenant.

\* \* \*

(v) *Capital Work.*  In the event Landlord or Tenant believes that any Capital Work (as defined herein) is required during the Term, the party proposing such work shall provide written notice of same to the other party with a reasonably detailed description of the Capital Work that the proponent wishes to have done ("Capital Work Notice"). The term "Capital Work" shall mean any repair or replacement to the Building of a capital nature where the useful life of such capital repair or replacement is expected to be ten (10) years or more and the cost of any such item in any particular year is in excess of $100,000.

3

\* \* \*

## Section 11.  Indemnities

(a) Tenant shall indemnify, protect, defend (including reasonable attorneys' fees) and hold harmless the Landlord, Landlord's Agents, and its and their respective directors, officers, managers, associates, employees, agents, representatives, contractors and consultants (collectively, the "Landlord Indemnified Parties") from and against any third party claims and losses suffered by Landlord arising from:  (i) Tenant's particular use or particular manner of use of the Premises (as distinguished from use of the Premises for the Proposed Use); and (ii) any act, negligence, or willful misconduct of Tenant or Tenant's Affiliates, whether occurring on the Premises or on any appurtenant areas during the Term. Tenant's indemnity obligations will include, but not be limited to, any and all penalties, assessments, fines, damages, interest, settlement amounts, judgments, reasonable attorneys' fees, and other expenses, and will survive the expiration or other termination of this Lease, provided, however, that this indemnification obligation shall not apply to environmental matters, which are addressed exclusively in Section 16 hereof.

\* \* \*

## Section 18.    Tenant Alterations and Additions; Tenant Improvement Allowance

(a) Tenant may make any alterations, improvements, or additions to the Premises (each, a "Tenant's Change", and collectively, the "Tenant's Changes") that do not cost in excess of $100,000.00, without Landlord's prior written consent (each, a "Permitted Change", and collectively, the "Permitted Changes").  Tenant must obtain Landlord's prior written consent to any Tenant's Change that shall cost in excess of $100,000.00, which consent Landlord agrees not to unreasonably withhold, condition, or delay.  As part of its approval process, Landlord may require that Tenant submit plans and specifications to Landlord, for Landlord's approval or disapproval, which approval shall not be unreasonably withheld, conditioned, or delayed.

\* \* \*

(c) Tenant agrees to indemnify, hold the Landlord Indemnified Parties' harmless from, and defend against all liens, claims and liabilities of every kind, nature and description that arises out of or in any way is connected with any Tenant's Changes.

Lease Agreement 24–25, 30–32, 34–35, 45–46.

**B. The Alleged Breach**

In July 2022, Defendant took possession of the Premises pursuant to the Lease.  Compl. ¶ 8.  That same month, Defendant obtained a proposal from TRW Enterprises, Inc. ("TRW"), wherein TRW—a Tulsa, Oklahoma-based construction company—offered to perform work on the interior concrete control and expansion joints ("Floor Joints") at the Premises (the "TRW Proposal").  Compl. ¶ 9.  Therein, TRW opined that "to not seal these joints . . . would be a very expensive situation in the near future."  Compl. Ex. B ("Proposal") 2, ECF No. 2-2.  TRW thus proposed to use a "2-part epoxy by sika that's actually harder than concrete" to seal the Floor Joints.  *Id.*; Compl. ¶ 10.  The cost of the proposal was noted to be $630,000.  Proposal 2; Compl. ¶ 9.  Defendant ultimately accepted the TRW Proposal and subsequently directed and paid TRW to perform work at the Premises as outlined therein.  Compl. ¶ 11.  TRW then performed the proposed work on behalf of Defendant in the fall of 2022, using "a 2-part epoxy" that is "harder than concrete."  *Id.* ¶ 12.

Following TRW's completion of the proposed work, Defendant's representatives engaged in internal email discussions regarding the conditions of the floors at the Premises.  *Id.* ¶ 13.  On November 30, 2022, one of Defendant's employees, Anthony Chastain, wrote, "[s]ee attached for some of the slab cracks we're seeing.  All the control joints have been poured full of concrete instead of caulk.  No idea why this was done unless someone was trying to cut corners on a budget."  *Id.*; Compl. Ex. C ("Chastain Email") 2, ECF No. 2-3.  Chastain continued, "[s]ome of the cracks are still following the control joints, but closer to the middle of the building the cracks start to spiderweb. . . .  Likely this is due to all the stress from the perimeter slab pressing against the core of the slab."  Chastain Email 2.  Chastain also noted that the Premises are "only six months old, and we've only been in [the Premises] for half that time."  *Id.*  Chastain continued, "I'd expect this

5

to get much worse [with changing temperatures] as many of these cracks didn't appear until the end of summer / beginning of fall . . . .   There's the potential . . . this situation will continue to deteriorate."  *Id.*

Chastain was not Defendant's only employee voicing such concerns.  *See* Compl. ¶ 13. For instance, Michael Feller noted on December 1, 2022, that while "some cracking was already present when [Defendant] entered the building . . . [the] photos [showing cracking] do cause concern."  Compl. Ex. D ("Dec. 2022 Email Chain") 5, ECF No. 2-4.  And Michael Jeter, Defendant's Senior Manager, Mechanical and Construction, stated that "this slab is less than a year old and the structural issues are alarming as well as concern for increased degradation."  *Id.* at 4.  Based on these concerns, Defendant's employees forwarded the December 2022 Email Chain to Plaintiffs on December 1, 2022, requesting that Plaintiffs address the floor issues raised therein. Compl. ¶¶ 15–16.  Until this point, Plaintiffs were unaware that Defendant had performed any work on the floors at the Premises.  *Id.* at ¶ 16.

Plaintiffs responded to Defendant's email on December 2, 2022.  *See*  Dec. 2022 Email Chain 2–3.  In short, Plaintiffs explained that (1) the existing conditions and damage to the floors resulted from work performed by Defendant and its contractors, and (2) Defendant needed to promptly address the "alarming" structural conditions it caused at the Premises.  Compl. ¶ 17; *see* Dec. 2022 Email Chain 2–3.  Plaintiffs also noted that, while Section 7(d) of the Lease was modified to "allow [Defendant] to do the control joint filling," Plaintiffs "understood [Defendant] would be using Metzger MM-80 semi-rigid epoxy for the control joint filing," rather than a "2-part epoxy by sika that's actually harder than concrete."  Dec. 2022 Email Chain 3.  Plaintiffs preferred the MM-80 product because it "allows for the normal thermal expansion and contraction of the concrete at the control joints."  *Id.*  Conversely, a harder product—i.e., the "2-part epoxy"

used by Defendant—would essentially operate to "glue[] the sections of concrete back together again, defeating the intended stress relief of the control joints," and potentially lead to the sort of cracking that ultimately followed. *Id.*

Since December 2022, Plaintiffs and Defendant have continued to communicate about the work performed by Defendant at the Premises. Compl. ¶ 18. The parties apparently agree that the work performed by Defendant was improper and caused damage to the floors at the Premises. *Id.* However, while Defendant has performed some mitigative work, it has not "presented Plaintiffs with a proposal to return the floors to their condition prior to Defendant performing improper and unapproved work on the floors at the Premises." *Id.*

## II. PROCEDURAL HISTORY

Plaintiffs filed a two-count Complaint on July 28, 2023, seeking damages for breach of contract and indemnification, as well as a declaratory judgment clarifying Defendant's obligations under the Lease. Compl. ¶¶ 44–60. On September 13, 2023, Defendant filed the instant Motion to Dismiss and Memorandum in Support thereof. ECF Nos. 13 and 14. Plaintiffs filed their Memorandum in Opposition to Defendant's Motion to Dismiss on September 26, 2023. ECF No. 15. Defendant filed a Reply in Support of its Motion to Dismiss on October 2, 2023. ECF No. 16. Accordingly, this matter is ripe for review.

## III. LEGAL STANDARD

### A. Rule 12(b)(1)

"Subject matter jurisdiction is a threshold issue" which a court "must address before addressing the merits" of a claim. *Jones v. Am. Postal Workers Union*, 192 F.3d 417, 422 (4th Cir. 1999); *see also Hendiazad v. Ocwen Loan Serv'g, LLC*, 828 F. App'x 923, 924 (4th Cir. 2020) ("Before proceeding to the merits, a federal court must satisfy itself that it has jurisdictional

power to rule on the merits of a case." (alteration and internal quotation marks omitted)).  Without subject matter jurisdiction, "a court can only decide that it does not have jurisdiction." *Burrell v. Bayer Corp.*, 918 F.3d 372, 379 (4th Cir. 2019).  When a defendant makes a facial challenge to subject matter jurisdiction—i.e., by contending that the complaint fails to allege facts upon which subject matter jurisdiction can be based—the "plaintiff . . . is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration."  *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009).  That is, the facts in the complaint are taken as true, and the motion to dismiss must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction.  *Id.*

**B.  Rule 12(b)(6)**

  "A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)).  Dismissals under Rule 12(b)(6) are generally disfavored by the courts because of their res judicata effect.  *Fayetteville Invs. v. Com. Builders, Inc.*, 936 F.2d 1462, 1471 (4th Cir. 1991).  Federal Rule of Civil Procedure 8 only requires that a complaint set forth "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," "detailed factual allegations" are not required in order to satisfy the pleading requirement of Federal Rule 8(a)(2).  *Id.* (citations omitted).  "[A] motion to dismiss for failure to state a claim

should not be granted unless it appears certain that the plaintiff can prove no set of facts which would support its claim and would entitle it to relief." *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). The plaintiff's well-pleaded allegations are assumed to be true, and the complaint is viewed in the light most favorable to the plaintiff. *Id.* (citations omitted); *see also Martin*, 980 F.2d at 952.

Nevertheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Labels and conclusions," a "formulaic recitation of the elements," and "naked assertions" without factual enhancement are insufficient. *Id.*

## IV. DISCUSSION

Defendant presents several arguments in support of its Motion to Dismiss. Defendant first argues that Plaintiffs make no plausible allegations that Defendant breached the Lease and/or caused Plaintiffs to suffer losses that trigger the indemnity provisions of the Lease. Def.'s Mem. Supp. Mot. Dismiss ("Mem. Supp.") 1–3, ECF No. 14. Defendant next argues that this Court should decline to exercise jurisdiction over Plaintiffs' declaratory judgment count. *Id.* at 8. Finally, Defendant argues that this matter should alternatively be dismissed as unripe for adjudication. *Id.* at 10. The Court considers these arguments below.

**A. Ripeness**

The first issue the Court will take up concerns whether Plaintiffs' claims are ripe for adjudication.  Defendant argues, albeit briefly, that neither claim is ripe and that a Rule 12(b)(1)-based dismissal is therefore warranted.  *See* Mem. Supp. 10.  The Court disagrees.

Ripeness is a justiciability doctrine designed to "prevent the courts, through avoidance of premature disputes, from entangling themselves in abstract disagreements."  *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148–49 (1967).  The doctrine itself stems largely from the "case or controversy" constraint of Article III and thus presents a "threshold question [] of justiciability" that must be dealt with before proceeding to more substantive considerations.  *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC,* 713 F.3d 187, 195 (4th Cir. 2013)); *see Whitaker v. Monroe Staffing Servs., LLC*, 42 F.4th 200, 206 (4th Cir. 2022) (noting that "ripeness is a Constitutional limitation on federal court jurisdiction" and therefore must be dealt with "before considering the merits of a claim"); *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993) ("[The] ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.")

Determining whether a case is ripe for judicial review involves an evaluation of both the fitness of the issues before the court as well as the hardship that the parties will experience if the court withholds consideration of the dispute.  *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 270 (4th Cir. 2013).  A case is ripe for adjudication where "the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties."  *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006).  Alternatively, a case is *not* ripe for adjudication "if it rests upon contingent future events that may not occur as anticipated or indeed may not occur at all."  *Texas v. United States*, 523 U.S. 296, 300 (1998).

Defendant lodges a facial challenge to this Court's jurisdiction by arguing that "neither of [Plaintiffs'] two counts are ripe for adjudication because they both 'rest[] upon contingent future events that may not occur as anticipated or indeed may not occur at all.'" Mem. Supp. 10 (quoting *Texas*, 523 U.S. at 300); *see Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (noting that a facial challenge occurs when the defendant contends that a complaint fails to allege facts upon which subject matter jurisdiction can be based). As to Count I, Defendant argues that Plaintiffs' breach of contract and indemnification allegations presume either a sale or repair, "both of which 'may not occur at all.'" *Id.* (quoting *Texas*, 523 U.S. at 300). Defendant then argues that Count II prematurely asks for a declaration concerning the scope and timing of necessary repairs. *Id.* Defendant contends that such a request is premature because the scope and timing of repairs "depends entirely on the condition of the Premises when [Defendant] returns them to [Plaintiffs]— which could be as late as 2047." *Id.* Plaintiffs respond that their claims do not rest upon contingent future events, but instead "seek to hold [Defendant] responsible for damage that has already occurred and that [Defendant] is obligated to correct." Pl.'s Mem. Opp'n Def.'s Mot. Dismiss ("Mem. Opp'n") 13, ECF No. 15. A thorough review of the Complaint and attached documentation supports Plaintiffs' position on both counts.

    1. Count I of the Complaint

In Count I, Plaintiffs allege that Defendant's "unapproved and improper work" on the floors of the Premises constitutes a "material[] breach[] . . . of the Lease." Compl. ¶¶ 50, 53. Plaintiffs further contend that this breach resulted in $24,000,000.00 in damages. *Id.* ¶ 49. This number represents the alleged diminution in property value of the Premises caused by Defendant's breach. *Id.* ¶¶ 49, 54. Plaintiffs also allege that, because of Defendant's breach, the floors at the Premises will need to be removed and replaced. *Id.* ¶ 50. Plaintiffs aver that such work will cost

more than $9,000,000.00.  *Id.* ¶ 50.  Lastly, Plaintiffs allege that Defendant breached the indemnification provisions of the Lease by failing to indemnify Plaintiffs for its purported losses. *Id.* ¶¶ 31, 37, 51  These allegations are sufficient to render Count I ripe.

The Court first reiterates that, at this stage, it accepts all well-pleaded factual allegations as true.  *See Kerns*, 585 F.3d at 192.  With that in mind, it is evident that the issues presented in Count I are "fit for judicial decision."  *See Miller*, 462 F.3d at 319.  Plaintiffs allege present, ongoing losses stemming from Defendant's breach.  Compl. ¶¶ 49–50, 53–54 (alleging that Defendant's actions have both damaged the Premises and diminished their value).  Defendant's argument to the contrary—that any such damages "presume either a sale or a repair"—is misguided.  *See* Mem. Supp. 10.  Simply, Plaintiffs own the Premises.  To the extent the value of the Premises has indeed been diminished by Defendant's breach, that is a cognizable loss that renders Count I ripe.  *See Casanova v. Marathon Corp.*, 256 F.R.D. 11, 15 (D.D.C. 2009) (noting that a breach of contract claim "cannot be described as premature because [it] speak[s] of damages that have already been suffered and are being suffered").[4]

Plaintiffs' indemnification-related claim is ripe for essentially the same reason—namely, it is based on *existing* contractual provisions that Plaintiffs allege Defendant has *already breached*. *See* Compl. ¶¶ 31, 37, 51.  Such a scenario is plainly distinguishable from those indemnification

---

[4] The foregoing analysis is further bolstered by the fact that Virginia law, which governs the substance of this case, *see infra* Part IV.B.1., explicitly recognizes the sort of losses that Plaintiffs claim.  *See  Nichols Constr. Corp. v. Va. Mach. Tool Co.*, 276 Va. 81, 89–90 (2008) (recognizing the availability of both diminution in property value damages and cost of repairs damages in Virginia breach of contract suits); *Manchester Oaks Homeowners Ass'n v. Batt*, 284 Va. 409, 424 (2012) (indicating that diminution in property value is a valid measure of damages in Virginia breach of contract suits).  To be sure, the question of whether a claim is ripe is "a legal question governed by federal law."  *See Sansotta v. Town of Nags Head*, 724 F.3d 533, 544 (4th Cir. 2013); *Beatley v. Ayers*, 851 F. App'x 332, 336 (4th Cir. 2021).  However, it is nevertheless relevant that it would "contravene state law" to hold that Plaintiffs' claims against Defendant are unripe.  *Drs. Hosp. at Renaissance, Ltd. v. Emps. Ins. Co. of Wausau*, 579 F. Supp. 3d 912, 921 (S.D. Tex. 2022); *see Hart v. State Farm Fire & Cas. Ins. Co.*, 556 F. Supp. 3d 735, 741–42 (E.D. Mich. 2021) (holding that the plaintiffs' claim was ripe in light of governing state law); *Medline Indus., Inc. v. Ram Med., Inc.*, 892 F. Supp. 2d 957, 964–68 (N.D. Ill. 2012) (analyzing the relevant state law to determine whether Plaintiff's diversity action was ripe).

scenarios that most often give rise to ripeness issues.  *See, e.g., A/S J. Ludwig Mowinckles Rederi v. Tidewater Constr. Co.*, 559 F.2d 928, 932 (4th Cir. 1977) (holding as unripe an indemnification claim where "there has been neither a determination of liability nor a settlement in any of the [underlying] actions pending against [the defendants]"); *Michael Pellis Architecture PLC v. M.L. Bell Constr. LLC*, --- F. Supp. 3d ---, 2023 WL 6222623, at *10 (E.D. Va. Sept. 22, 2023) (holding as unripe an indemnification claim that depended on future uninsured liability claims); *Seneca Ins. Co., Inc. v. Fayetteville Cross Creek, LLC*, 528 F. Supp. 3d 397, 402 (M.D.N.C. 2021) (holding as unripe an indemnification claim that depended on further factual determinations in a different legal proceeding).  Here, Defendant's purported liability does not rest upon any such "contingent future events."  *Texas*, 523 U.S. at 300.  Accordingly, there is no concern that the Court will become "entangled in abstract disagreements" by wading into this dispute.  *Scoggins*, 718 F.3d at 270.[5]

Finally, the Court notes that while Defendant's argument on this issue is styled as a ripeness challenge, it is, in substance, a challenge to the merits of Plaintiffs' breach of contract claim.  *See* Mem. Supp. 10.  The thrust of Defendant's ripeness argument is that Plaintiffs are not entitled to the damages they seek because they have not yet sold or otherwise repaired the Premises.  *Id.* However, such an argument goes more to the merits of Plaintiffs' breach of contract claim—and specifically, the scope/extent of damages—than it does to the issue of ripeness—whether the dispute is sufficiently non-abstract.  This provides yet further support for the Court's conclusion that Count I is ripe.  *See Whitaker*, 42 F.4th at 208 (noting that a merits-based argument "does not implicate the court's jurisdiction to entertain the breach of contract claim as pleaded"); *see also Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992) ("[T]hough the trial court may

---

[5] Certainly, further factual development may ultimately be *relevant* to some of the issues raised in this matter (e.g., the *exact* scope of damages).  However, the existing factual allegations render this matter sufficiently non-abstract for Article III purposes.  *See Abbott Lab'ys*, 387 U.S. at 148–49.

rule on disputed jurisdictional facts at any time, if they are inextricably intertwined with the merits of the case it should usually defer its jurisdictional decision until the merits are heard.").

    2. <u>Count II of the Complaint</u>

    In Count II, Plaintiffs first incorporate all the same factual matter underlying Count I. Compl. ¶ 56. Plaintiffs then allege that while they and Defendant "agree that Defendant is responsible for damage caused to the Premises," the parties "disagree regarding (i) the appropriate scope of repair/replacement and (ii) when the damage to the floors need to be corrected." *Id.* ¶ 58. Given this disagreement, Plaintiffs (1) allege that a justiciable controversy exists and (2) ask the Court to declare the parties' respective obligations on the disputed issues. *Id.* ¶¶ 59–60. Plaintiffs also ask to be "relieved of any maintenance obligations existing under the Lease that may arise as a result of the work performed by Defendant on the floors/Floor Joints." *Id.* ¶ 60. As was the case with Count I, the allegations are sufficient to render Count II ripe for adjudication.

    By way of background, the Declaratory Judgment Act empowers district courts, "i[n] . . . case[s] of actual controversy within [their] jurisdiction[,]" to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). "[T]he phrase 'case of actual controversy' in the Act refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). Declaratory judgment actions are therefore subject to the same Article III justiciability requirements as all other suits brought in federal court. *See id.*; *Scoggins*, 718 F.3d at 269.

    Because the justiciability requirements in declaratory judgment actions are coextensive with those for all other actions brought in federal court, and because Plaintiffs rely on essentially the same allegations for both counts, the ripeness inquiry for Count II goes much the same as it did for Count I. In Count II, Plaintiffs have alleged (1) the existence of a legally enforceable

contract; (2) that Defendant has breached said contract; (3) that Defendant's breach resulted in damages; and (4) that Plaintiffs and Defendant disagree regarding the "appropriate scope of repair/replace and . . . when the damage to the floors needs to be corrected."  Compl. ¶¶ 23–39, 42–56, 58–60.  For the same reasons outlined as to Count I, these allegations demonstrate a dispute that is hardly "abstract."  *Scoggins*, 718 F.3d 270; *see supra* Part IV.A.1.

Moreover, Plaintiffs' request that this Court provide a forward-looking declaration outlining the parties' respective obligations in the wake of Defendant's alleged breach provides further support for the Court's holding that Count II is ripe for adjudication.  Indeed, numerous courts have held analogous declaratory judgment claims to be ripe.  *See Whitaker*, 42 F.4th at 208 (holding as ripe the plaintiff's claim for declaratory relief where the defendant allegedly breached its contract with the plaintiff); *see also RDP Techs. v. Cambi AS*, 800 F. Supp. 2d 127, 136 (D.D.C. 2011) (holding as ripe the plaintiff's claim for declaratory relief where the plaintiff was allegedly denied "[that] to which it is contractually entitled"); *Blitz Telecom Consulting, LLC v. Peerless Network, Inc.*, 151 F. Supp. 3d 1294, 1302–03 (M.D. Fla. 2015) (holding as ripe a declaratory judgment action wherein "the parties hotly contest[ed] their rights and remedies under the contract"); *Welding Eng'rs Ltd. v. NFM/Welding Eng'rs, Inc.*, 352 F. Supp. 3d 416, 431–32 (E.D. Pa. 2018) (holding that "all of the ripeness factors are present" where an "actual dispute" exists regarding what was *presently* required under certain contractual language).  Such a request evinces a "definite," "concrete" dispute wherein Plaintiffs seek "specific relief through a decree of a conclusive character," as opposed to an opinion "advising what the law would be upon a hypothetical set of facts."  *Aetna Life Ins. Co. v. Hawarth*, 300 U.S. 227, 240–41 (1937); *see MedImmune*, 549 U.S. at 127 (quoting *Aetna Life Ins. Co.*, 300 U.S. at 240–41).

In sum, Plaintiff's claims relate to ongoing legal issues that "do not depend on future uncertainties." *Miller*, 462 F.3d at 319.  Counts I and II are therefore both ripe for adjudication, and Defendant's ripeness challenge under Rule 12(b)(1) will be denied.

## B.  Breach of Contract and Indemnification

Now certain of its jurisdiction, the Court turns to the substance of Defendant's Motion to Dismiss.  Defendant argues that it could not have breached the Lease because the complained-of Floor-Joint work did not require Plaintiffs' approval.  Mem. Supp. 4, 6.  Defendant also contends that, to the extent Plaintiffs "attempt to plead that [Defendant] breached the indemnity provisions of the Lease, the Complaint does not allege facts that create a present right of indemnification." *Id.* at 6.  Plaintiff, naturally, opposes both arguments.  *See* Mem. Opp'n 4–11.  The Court will analyze these arguments following a brief review of the guiding legal principles.

1.  Contract Interpretation Under Virginia Law[6]

"Federal court[s] sitting in diversity jurisdiction must apply the choice-of-law rules of the forum state." *United Gov't Sec. Officers of Am. v. Special Operations Grp., Inc.*, 436 F. Supp. 2d 790, 792 (E.D. Va. 2006) (citing *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941)).  Here, Virginia is the forum, rendering Virginia choice-of-law rules applicable.  *See id.* Notably, Virginia typically honors contractual choice-of-law provisions.  *See Acken v. Kroger Co.*, 58 F. Supp. 3d 620, 626 n.6 (E.D. Va. 2014) (citing *Thornhill v. Donnkenny, Inc.,* 823 F.2d 782, 786 (4th Cir.1987)); *see, e.g., Route Triple Seven Ltd. P'ship v. Total Hockey, Inc.*, 127 F. Supp. 607, 612 n.3 (E.D. Va. 2015).  The Lease has such a provision, which designates that it "shall be interpreted under the laws of the State where the Premises are situated"—i.e., Virginia.  Moreover,

---

[6] The Virginia Supreme Court has held that "[a] lease is a contract" to be interpreted just as any other contract. *See Landmark HHH, LLC v. Gi Hwa Park*, 277 Va. 50, 55 (2009).  As such, contract interpretation principles will guide the Court's inquiry in this matter.

the parties do not appear to dispute the applicability of Virginia law.  *See* Mem. Supp. 2–3, 6–8;

Mem. Opp'n 9.   Accordingly, Virginia law governs this dispute.

Under Virginia law, when the terms in a contract are "clear and unambiguous, the contract

is construed according to its plain meaning." *Barber v. VistaRMS, Inc.*, 272 Va. 319, 329 (2006).

Further, contracts must be interpreted "in accordance with the intention of the parties gleaned from

the words *used in the document*." *TravCo Ins. Co. v. Ward*, 284 Va. 547, 552 (2012) (emphasis

added).  While courts "must not strain to find ambiguities" in a contract, *Res. Bankshares Corp. v.*

*St. Paul Mercury Ins. Co.*, 407 F.3d 631, 636 (4th Cir. 2005) (collecting Supreme Court of Virginia

decisions), contractual provisions may nevertheless be deemed ambiguous where the "language

[used] is of doubtful import, admits of being understood in more than one way, admits of two or

more meanings, or refers to two or more things at the same time." *Cascades N. Venture Ltd. P'ship*

*v. PRC Inc.*, 249 Va. 574, 579 (1995); *see Medlin & Son Constr. Co.*, *v. Matthews Grp., Inc.*, 2016

WL 7031843, at *7 (Va. Nov. 23, 2016).  Finally, contractual ambiguities may not be resolved at

the motion to dismiss stage.  *See Greater Richmond Civic Recreation, Inc. v. A.H. Ewing's Sons,*

*Inc.*, 200 Va. 593, 596–97 (1959).  Instead, "[t]he construction of an ambiguous contract is a matter

submitted to the trier of fact who must examine the extrinsic evidence to determine the intention

of the parties." *Tuomala v. Regent Univ.*, 252 Va. 368, 374 (1996).  With these principles in mind,

the Court turns to the parties' arguments.

2. Contractual Ambiguities Preclude Dismissal of Plaintiff's Breach of Contract Claim

Defendant first urges dismissal of Plaintiffs' Complaint on the grounds that the Lease did

not "require [Defendant] to obtain [Plaintiffs'] approval for the complained-of [Floor Joint] work."

Mem. Supp. 6.  According to Defendant, the parties instead "viewed this work as necessary repairs

to the floor" arising under a separate provision of the Lease—§ 7(d).  *Id.* at 4.  And § 7(d),

17

Defendant continues, "contains no approval condition." *Id.* at 4.  Defendant therefore argues that its failure to obtain advance approval did not breach any provision of the Lease.  *Id.*  Defendant bolsters its argument by reference to both (1) correspondence between the parties following Defendant's alleged breach, and (2) the language of the Lease itself.  *See id.* at 3–6.  As to the former, Defendant cites an email sent by Tom Wortham ("Wortham") on behalf of Plaintiffs, *see id.* at 4; therein, Wortham noted that § 7(d) of the Lease "was modified to allow [Defendant] to do the control joint filling."[7]  December 2022 Email Chain 3.  Per Defendant, this email shows that the complained-of work was a "repair," requiring no prior approval.  Mem. Supp. 4.  And as to the Lease language, Defendant contends that the plain language of the relevant provisions supports its position that advance approval was not required for the complained-of Floor Joint work.  Mem. Supp. 4–6.  Specifically, Defendant argues that the Lease does not require advance approval for "repairs," such as the Floor Joint work.  *Id.*  Instead, the Lease only requires such advance approval for "alterations, improvements, or additions."  *Id.*

Plaintiffs raise several arguments in response.  First, Plaintiffs argue that the Floor Joint work was *not* a "repair" free from advance approval requirements.  Mem. Opp'n 5.  In support of this argument, Plaintiffs cite the dictionary definition of repair and emphasize that the term typically connotes some sort of restoration.  *Id.*  Plaintiffs then note that the concrete floor of the Premises was "practically brand new and . . . no forklift or stock picker had yet entered" the Premises.  *Id.*  As such, Plaintiffs contend that any work on the Floor Joints could hardly be deemed a "repair."  *Id.*  Next, Plaintiffs argue that the Wortham email "does not, in any way, prove that work on the [F]loor [J]oints was a repair that could be undertaken without [Plaintiffs'] permission."  *Id.* at 6.  Rather, Plaintiffs assert that Wortham's email shows only that § 7(d) of the Lease "places

---

[7] The email in question was attached to Plaintiffs' Complaint and may therefore be considered at this stage.  *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011).

the responsibility of the control joint filling on [Defendant]," and that "it was [Plaintiffs'] understanding that [Defendant] 'would be using Metzger MM-80 semi-rigid epoxy for control joint filling.'" *Id.* at 6 (quoting December 2022 Email Chain 3).  Plaintiffs further argue that, "[t]o the extent Wortham's email can be construed as support that [Defendant] had [Plaintiffs'] authorization for the [Floor Joint] work . . . clearly any such authorization was limited to the use of MM-80, which is not the product that [Defendant] used." *Id.*  Plaintiffs wrap up their response by arguing that Defendant's work on the Floor Joints was instead a "Tenant's Change"—i.e., an "alteration, improvement, or addition"—requiring Plaintiffs' prior written consent.  *See id.* at 7; Lease Agreement 45.[8]

In Virginia, the elements of a breach of contract claim are: (1) a legally enforceable obligation of a defendant to a plaintiff, (2) the defendant's violation or breach of that obligation, and (3) resulting injury or harm to the plaintiff.  *Filak v. George*, 267 Va. 612, 619 (2004).  With these elements in mind, the Court finds that Plaintiffs have alleged "sufficient factual matter, accepted as true," to support their breach of contract claim.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, Plaintiffs have alleged the existence of the Lease, which establishes certain legally enforceable obligations on behalf of both Plaintiffs and Defendant.  *See* Compl. ¶¶ 5, 8, 16, 19, 26–43; *see generally* Lease Agreement.  The existence of such obligations as a general matter appears to be undisputed.  *See generally* Mem. Supp; Mem. Opp'n.

---

[8] Plaintiffs also briefly argue that Defendant's position on this issue is "completely undermined by the fact that [Defendant] has sought [Plaintiffs'] permission to fix the damaged [sic] it caused to the [Premises]."  Mem. Opp'n 8.  Plaintiffs continue, "[i]f [Defendant] truly believed that this work on the [F]loor [J]oints was a 'repair' . . . it could have understaken to remove and replace the filler without ever contacting Plaintiffs."  *Id.*  However, the Court need not reach this argument for the reasons outlined *infra*.

Second, Plaintiffs have alleged that Defendant breached the provisions of the Lease by, *inter alia*, failing to obtain advance approval as required under § 18(a) of the Lease. *See* Compl. ¶ 29–33.   As outlined above, the parties' present dispute primarily concerns this element. Defendant argues that the Floor Joint work was a "repair" governed by § 7(d). *See* Mem. Supp. 3–6.   Defendant thus concludes that Plaintiffs' advance approval was not required for the Floor Joint work, and that its failure to obtain such approval cannot constitute a breach of its contractual obligations. *See id.* at 3–4, 6.   Plaintiffs retort that the Floor Joint work was instead a "Tenants Change"—an "alteration, addition, or improvement" to the Premises—that did in fact require Plaintiffs' advance approval pursuant to § 18(a) of the Lease.   Plaintiffs contend that Defendant's failure to obtain such approval therefore represents a breach of Defendant's obligations under the Lease.   The dispositive question on this element, then, is whether the Floor Joint work was a "repair."   If the answer is yes, no advance approval was needed, and Defendant's actions did not breach the Lease provisions.   If the answer is no, advance approval was required, Defendant's alleged neglect to obtain such approval constitutes a breach, and the inquiry may continue.

A review of the Lease provides little guidance on this issue.   "Repair" is not defined in the Lease.   *See generally* Lease Agreement.   "Alterations," "improvements," and "additions" are likewise undefined.   *See generally id.*   Resort to dictionary definitions[9] is of little use as well, as there is significant overlap in the definitions of the contested terms.   *Compare Repair*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("To restore to a sound or good condition after decay, waste, injury . . . to fix . . . to renew, revive, or rebuild . . . to mend, . . . or make right again.") *with Alteration*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("A substantial change to real estate, esp[ecially] to a structure . . . to constitute an alteration, the change must be substantial.") *and*

---

[9] "Virginia courts customarily turn to dictionaries for help in deciphering a term's plain meaning." *Travelers Indem. Co. of Am. v. Portal Healthcare Sols., LLC*, 35 F. Supp. 3d 765, 770 (E.D. Va. 2014)

*Improvement*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("An addition to property . . . whether permanent or not; esp[ecially] one that increases its value or utility or that enhances its appearance.").[10]

As these definitions reveal, a "repair" may very well be a type of "alteration" or "improvement." For instance, repairs that "rebuild" property surely qualify as "addition[s] to property . . . that increase[] its value." The inverse is also true—it is certainly possible that a "substantial change to . . . a structure" may occur when one "renew[s], revive[s], or rebuild[s]" it. Indeed, the present facts provide a prime example of such a scenario—it would defy common sense to suggest that the $650,000.00 Floor Joint "repairs" here did not substantially change the Premises. In fact, the very purpose of the Floor Joint work was apparently to increase and/or enhance the utility of the Premises for Defendant's intended purpose. *See* Proposal 2.

Cognizant that courts "must not strain to find ambiguities" in a contract, *Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 636 (4th Cir. 2005) (collecting Supreme Court of Virginia decisions), the Court nevertheless finds that the relevant provisions of the Lease are ambiguous. As outlined above, it is entirely possible for "repair" to refer to the same sort of activity or process that "alteration," "addition," and/or "improvement" describe. The plain meaning of the disputed language is therefore "of doubtful import, admits of being understood in more than one way, admits of two or more meanings, [and] refers to two or more things at the same time." *Cascades N. Venture Ltd. P'ship*, 249 Va. at 579; *see Medlin & Son Constr. Co.*, 2016 WL 7031843, at *7. The briefing also bears this out, as the parties quite literally cite

---

[10] A review of standard dictionary definitions produces similar findings. *Compare, e.g., Repair*, MERRIAM-WEBSTER'S DICTIONARY (defining repair as an instance of "restor[ing] by replacing a part or putting together what is torn or broken," "restor[ing] to a sound . . . state," and "maki[ng] good") *with Alteration*, MERRIAM-WEBSTER'S DICTIONARY (defining alteration as the "act or process of altering something," and "the result of changing . . . something") *and Addition*, MERRIAM-WEBSTER'S DICTIONARY (defining addition as "a part added" and "anything . . . added"). Again, there is significant overlap in the definitions of these terms.

*consecutive* dictionary definitions in support of their contrasting viewpoints. *Compare* Mem. Supp. 5 *with* Mem. Opp'n 5.

Importantly, contractual ambiguities like this may not be resolved at the motion to dismiss stage. *See Greater Richmond Civic Recreation, Inc.*, 200 Va. at 596–97. Rather, "[t]he construction of an ambiguous contract is a matter submitted to the trier of fact who must examine the extrinsic evidence to determine the intention of the parties." *Tuomala*, 252 Va. at 374 (1996); *see also Medlin & Son Constr. Co.,* 2016 WL 7031843, at *7. Accordingly, the Court declines to assess the extrinsic evidence referenced by the parties (i.e., the Wortham email). *See id.* Instead, the Court holds that that there is "an ambiguity in the contract which, as a matter of law, cannot be dismissed at this stage." *Variety Store, Inc. v. Martinsville Plaza, LLC*, 2020 WL 1052525, at *4 (W.D. Va. Mar. 4, 2020).[11] Plaintiffs' breach of contract claim may therefore proceed.

### 3. Plaintiffs' Indemnification Claim Has Yet to Accrue

Count I of Plaintiffs' Complaint is styled as a "Breach of Contract and Indemnification Count." *See* Compl. Count I. For the reasons outlined above, the breach of contract portion of Count I survives Defendant's Motion to Dismiss. The parties, however, raise slightly different arguments regarding the indemnification portion of Count I. For the reasons discussed below, the Court will sever and dismiss the indemnification-related portions of Count I.

Defendant urges dismissal of Plaintiffs' indemnification claim on the grounds that Plaintiffs' right to assert such a claim has not yet accrued. *See* Mem. Supp. 6–8. Defendant argues

---

[11] The existence of contractual ambiguities largely resolves this portion of the inquiry. *See Variety Store, Inc.*, 2020 WL 1052525, at *4. However, for the sake of completeness, the Court also notes that Plaintiffs allege sufficient facts to satisfy the third element of their breach of contract claim—resulting injury or harm. *See Filak*, 267 Va. at 219. Namely, Plaintiffs allege $24,000,000.00 in damages, representing the apparent diminution in value of the Premises resulting from Defendant's purported breach. Compl. ¶¶ 43, 49. Such damages are cognizable under Virginia law. *See, e.g., Manchester Oaks Homeowners Ass'n, Inc. v. Batt*, 284 Va. 409, 424 (2012) (noting that diminution in property value may be the proper measure of damages in certain breach of contract cases).

that, under Virginia law, a right of action for indemnification does not accrue until the plaintiff suffers a loss, and more specifically, until the plaintiff pays out money to a third-party. *Id.* at 7 (citing *Kohl's Dep't Stores, Inc. v. Target Stores, Inc.*, 290 F. Supp. 2d 674, 689 (E.D. Va. 2003) (citing *Nationwide Mut. Ins. Co. v. Jewel Tea Co.*, 202 Va. 527, 118 S.E.2d 646, 649 (1961)). Defendant notes that "[t]he Complaint does not allege that [Plaintiffs have] suffered any loss (i.e., paid anything to a third-party) yet." *Id.* at 7. In the absence of such a "loss," Defendant contends dismissal is proper. *Id.* Defendant also argues that any indemnification-related allegations are speculative, because Plaintiffs "will not suffer any loss due to damage to the Premises unless and until . . . [Defendant] relinquishes its estate at the end of the leasehold *and fails to return the Premises to the necessary condition*." *Id.*

Plaintiffs respond that Defendant wholly ignores Plaintiffs' allegations pertaining to the diminution in property value resulting from the Floor Joint work. Mem. Opp'n 9. Plaintiffs argue that the alleged diminution in value constitutes a "loss" that gives rise to a right of action for indemnification. *Id.* Plaintiffs further argue that the cost to remove and replace the floors likewise constitutes a "damage[] for which [Defendant] has agreed to indemnify [Plaintiffs]." *Id.* Plaintiffs also emphasize that both parties expect the damage to the Premises to get much worse over time. *Id.* at 11. Plaintiffs thus argue that Defendant's contention that any losses are "speculative" is misplaced, given the parties' present concerns about the state of the Premises. *Id.* at 11.

Under § 8.01-249(5) of the Virginia Code, a right of action for indemnification accrues "when the . . . indemnitee has paid or discharged" its obligation. VA. CODE. ANN. § 8.01-249(5). Accordingly, a claim for indemnification "does not accrue until the indemnitee has suffered a loss." *Lone Mountain Processing, Inc. v. Bowser Morner, Inc.*, 94 F. App'x 149, 157–58 (4th Cir. 2004); *see First Va. Bank-Colonial v. Baker*, 225 Va. 72, 77 (1983) ([A] contract of indemnity is a

23

bilateral agreement between an indemnitor and an indemnitee in which the indemnitor promises to reimburse his indemnitee for loss suffered or to save him harmless from liability.").   In the indemnity context, a party typically suffers an actionable "loss" when it pays out money to a third party.   *See Kohl's Dep't Stores, Inc. v. Target Stores, Inc.*, 290 F. Supp. 2d 674, 689 (E.D. Va. 2003); *Nationwide Mut. Ins. Co. v. Jewel Tea Co.*, 202 Va. 527, 532 (1961).

In view of the aforementioned principles, Plaintiffs' allegations fail to establish that they have suffered a loss sufficient to trigger Defendant's indemnity obligations.   Simply, Plaintiffs have not alleged that they have paid out any money to a third party.   *See generally* Compl.   Instead, Plaintiffs' "loss" allegations concern only (1) diminution in property value and (2) estimated repair costs.   The former, to be sure, is an actionable injury for breach of contract purposes.   *See, e.g., Manchester Oaks Homeowners Ass'n, Inc. v. Batt*, 284 Va. 409, 424 (2012) (noting that diminution in property value may be the proper measure of damages in certain breach of contract cases). However, the same cannot be said for indemnification.   For an indemnification right of action to accrue, the plaintiff must suffer an injury, "i.e., pa[y] out money to a third party."   *See Kohl's Dep't Stores, Inc.*, 290 F. Supp. 2d at 689 (noting that § 8.01-249(5) codified the common law rule that "an action for indemnification [does] not accrue until the plaintiff suffer[s] an injury, *i.e., . . . pa[ys] out money to a third party*") (emphasis added).   Plaintiffs allege no such injury here. Plaintiffs repair cost allegations face the same pitfall—unless and until Plaintiffs incur some reimbursable cost,[12] their claim for indemnification will remain premature.   *See id.*

This result is further supported by the fact that Virginia law "maintains a sharp distinction between a 'right of action' and a 'cause of action.'"   *Id.* (citing *Gemco-Ware, Inc. v. Rongene Mold*

---

[12] For instance, if Plaintiffs (1) pay for repairs, (2) sell the property at the allegedly diminished price, or (3) otherwise incur some *presently reimbursable* cost, their indemnification claim will accrue.

& *Plastics Corp.*, 234 Va. 54, 57–58 (1987); *Caudill v. Wise Rambler, Inc.*, 210 Va. 11, 12–13 (1969)). A right of action is "a specific right of a specific person to enforce presently a remedial right." *Id.* A cause of action, on the other hand, is "an inchoate right; it is a set of facts which may give rise to a right of action." *Id.* In cases for indemnification, the cause of action and right of action do not arise at the same time. *Id.* "The accrual of the inchoate cause of action for indemnification arises at the time the underlying wrongful act is committed; the right of action for indemnification, however, does not arise until the party pays money to a third party to discharge an obligation caused by this wrongful act." *Id.* This case provides a prime example of this distinction. Here, Defendant allegedly committed a wrongful act. That wrongful act has apparently caused certain damages to Plaintiffs. Plaintiffs therefore have a "cause of action" for indemnification. However, Plaintiffs' fully-developed "right of action" for indemnification will not accrue unless Plaintiffs "pay[] money to a third party to discharge an obligation" caused by Defendant's wrongful act.[13] That has yet to occur. Severance and dismissal of Plaintiffs' indemnification-related claim is therefore warranted.[14]

## C. Declaratory Judgment

With Count II of the Complaint, Plaintiffs seek a declaratory judgment regarding (1) "the appropriate scope of repair/replacement," and (2) "when the damage to the floors needs to be

---

[13] This distinction also elucidates why Plaintiffs' claim is "ripe" for Article III purposes, but premature for Rule 12(b)(6) purposes. In short, the "set of facts . . . giv[ing] rise to" Plaintiffs' indemnification *cause* of action have already occurred, insofar as Plaintiffs have alleged a wrongful act (i.e., breach of contract) and resulting damages. *See Kohl's Dep't Stores*, 290 F. Supp. 2d at 692. Thus, there is nothing unduly "abstract" about this dispute, such as to render it unripe. *See Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148–49 (1967). However, because Plaintiff has not "pa[id] money to a third party to discharge an obligation," *see Kohl's Dep't Stores*, 290 F. Supp. 2d at 689, its *right* of action under state law has yet to accrue. *See id.*

[14] This holding relates only to the indemnification-specific portions of Count I. The remaining portions of Count I may proceed past the 12(b)(6) stage, as outlined above.

corrected." Compl. ¶ 58. Because a declaration on these issues would serve a useful purpose, the Court declines to dismiss Count II of Plaintiffs' Complaint.

Under the Declaratory Judgment Act, a district court, in a case or controversy otherwise within its jurisdiction, "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is sought." 28 U.S.C. § 2201(a). The Supreme Court has "repeatedly characterized the Declaratory Judgment Act as 'an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant.'" *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995) (quoting *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 241 (1952)). However, a district court's discretion in deciding whether to entertain a declaratory judgment action is not boundless. *See Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 584, 594 (4th Cir. 2004). Rather, "[a] district court must have 'good reason' for declining to exercise its declaratory judgment jurisdiction." *Id.* (quoting *Cont'l Cas. Co. v. Fuscardo*, 35 F.3d 963, 965 (4th Cir. 1994)).

The Fourth Circuit has elaborated on the considerations that should guide a district court's discretion in determining whether to entertain a declaratory judgment action. Specifically, the Fourth Circuit has held that a "district court is obliged to rule on the merits of a declaratory judgment action when declaratory relief 'will serve a useful purpose in clarifying and settling the legal relations in issue,' and 'will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" *Id.* (quoting *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 325 (4th Cir. 1937)). Conversely, courts in this circuit have deemed declaratory judgment claims inappropriate where such claims (1) seek to remedy past behavior rather than prevent future harm, (2) merely duplicate a breach of contract claim, or (3) otherwise request "essentially identical relief" to another claim. *Wenzel v. Knight*, 2015 WL 3466863, at *3 (E.D.

26

Va. June 1, 2015) (citing *Tapia v. U.S. Bank, N.A.*, 718 F. Supp. 2d 689, 695–96 (E.D. Va. 2010), *aff'd*, 441 F. App'x 166 (4th Cir. 2011); *Metra Indus., Inc. v. Rivanna Water & Sewer Auth.*, 2014 WL 652253, at *2 (W.D. Va. Feb. 19, 2014); *Seneca Ins. Co. v. Shipping Boxes I, LLC*, 30 F. Supp. 3d 506, 513 (E.D. Va. 2014)).

Defendant argues that the Court should discretionarily decline to entertain Plaintiffs' declaratory judgment count because it "duplicates Plaintiffs' breach of contract claim," and would "neither serve a useful purpose nor give the parties final relief." Mem. Supp. 8–9. In response, Plaintiffs argue that declaratory relief would in fact serve a useful purpose. *See* Mem. Opp'n 11– 12. Specifically, Plaintiffs contend that the requested declaration would "clarify and settle the appropriate scope of repair/replacement required by the Lease, and would eliminate any uncertainty as to when the damage to the floors needs to be corrected." Mem. Opp'n 12. Plaintiffs also note that, in the absence of such a declaration, Defendant "is willing to let the building continue to deteriorate while it pushes off these necessary repairs for a couple decades." *Id.* Per Plaintiffs, "[t]hat is no solution." *Id.*

Cognizant of its discretion, the Court ultimately declines to dismiss Count II of Plaintiffs' Complaint. The Court first notes that, contrary to Defendant's argument, Count I and Count II are materially different. For its part, Count I is aimed at remedying *past* behavior. *See* Compl. ¶¶ 44– 55 (seeking damages for Defendant's *prior* alleged breach of contract). Count II, on the other hand, is forward-looking. *See id.* ¶¶ 56–60 (seeking a declaration regarding what the parties' *future* repair/replacement obligations entail in the wake of Defendant's alleged breach). Accordingly, Count II does indeed "bring [some]thing to the complaint that is not achieved" by Count I. *Wenzel*, 2015 WL 346683, at *4.

Further, this matter is plainly distinguishable from the sorts of declaratory judgment claims that courts often decline to hear, insofar as Count II (1) seeks to prevent *future* harm, (2) does *not* merely duplicate Plaintiff's breach of contract claim (i.e., Count I), and (3) does *not* seek "essentially identical relief" to Count I.  *Compare* Compl. ¶¶ 44–60 (seeking declaratory relief distinct from the relief sought via the accompanying breach of contract count), *with Wenzel*, 2015 WL 3466863, at *3 (declining to entertain declaratory judgment count because it "did not bring anything to the complaint" that was not achieved by its breach of contract count), *and Variety Store, Inc. v. Martinsville Plaza, LLC*, 2020 WL 1052525, at *3 (W.D. Va. Mar. 4, 2020) (same), *and Metra Indus., Inc.*, 2014 WL 652253, at *2 (collecting cases in which courts found declaratory judgment actions unnecessary when brought only to resolve a parallel breach of contract claim). Put another way, Count II does not possess any of the "red flags" that typically render district courts hesitant to exercise jurisdiction over declaratory judgment actions.

Finally, an analysis of the principles outlined by the Fourth Circuit suggests that the Court should exercise jurisdiction over Count II.  First, a judgment on the contested matters would serve a useful purpose in clarifying and settling the legal relations at issue.  *See Quarles,* 92 F.2d at 325; *Pub. Serv. Comm'n of Utah*, 344 U.S. at 241.  Plaintiffs and Defendant continue to dispute both the scope and timing of the repair work that must done at the Premises pursuant to the Lease.  *See* Compl. ¶¶ 58–59.  Declaratory judgment on these issues would certainly clarify and settle the parties' respective obligations.  *See Wilton*, 515 U.S. at 287.  Judgment on the contested matters would likewise "terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Pub. Serv. Comm'n of Utah*, 344 U.S. at 241.  As both parties note, the Lease could potentially run for another twenty-five years.  *See* Mem. Supp. 8–9; Mem. Opp'n 11–12.  Given the "alarming" structural conditions that have allegedly resulted from the Floor

Joint work, *see* Compl. ¶ 17, along with Defendant's apparent refusal to presently make any significant repairs, *see id.* ¶¶ 39–41, a declaration regarding the scope and timing of remedial work would certainly "afford relief from the uncertainty" engendered by this situation.  *See Pub. Serv. Comm'n of Utah*, 344 U.S. at 241.

At bottom, the Court lacks "good reason to declin[e] to exercise its declaratory judgment jurisdiction." *Volvo Constr. Equip. N. Am., Inc.*, 386 F.3d at 594.  Count II of Plaintiffs' Complaint may therefore proceed.

## V. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss (ECF No. 13) will be granted-in-part and denied-in-part, as outlined herein.

An appropriate Order shall issue.

_____ /s/

Roderick C. Young
United States District Judge

Richmond, Virginia
Date: <u>March 21, 2024</u>