IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| SUMMIT INVESTMENTS II, *et al.*, <br>     Plaintiffs, <br><br> v. <br><br> SAM'S EAST, INC., <br>     Defendant and Third-Party Plaintiff, <br><br> v. <br><br> TRW ENTERPRISES, INC. <br>     Third-Party Defendant. | Civil Action No. 3:23CV479 (RCY) |

**MEMORANDUM OPINION**

This matter comes before the Court on Third-Party Defendant TRW Enterprises, Inc.'s ("TRW") Motion to Dismiss (ECF No. 31). The motion has been fully briefed, and the Court dispenses with oral argument because the facts and legal contentions are adequately presented in the materials before the Court, and oral argument would not aid in the decisional process. E.D. Va. Loc. Civ. R. 7(J). For the reasons stated herein, the Court will deny TRW's Motion to Dismiss (ECF No. 31).

**I. BACKGROUND**

When deciding a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court "accept[s] as true the plaintiff's well-pleaded allegations and views all facts and draws all reasonable inferences in the light most favorable to plaintiff." *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). Such a standard, however, does not require accepting any unreasonable inferences or plaintiff's legal conclusions. *Id.* Additionally, a court may consider any documents attached to the complaint. *E.I. du Pont de Nemours & Co. v. Kolon*

*Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011). Applying these standards, the Court construes the facts in the Third-Party Complaint, including any attached documents, as follows.

**A. The Premises, TRW's Floor Joint Proposal, and the Master Services Agreement**

Summit Investments II and Summit Investments V (together, "Summit") own, as tenants in common, a 650,250 square-foot industrial warehouse in Prince George, Virginia ("the Premises"). Third-Party Compl. ¶ 5, ECF No. 21; Compl. ¶¶ 3, 5, ECF No. 1[1]; Compl. Ex. A. ("Lease Agreement") 10, ECF No. 2-1. Prior to the lease presently at issue, the Premises were new and had not yet been occupied. Compl. ¶ 8.

On July 1, 2022, Summit entered into a Lease Agreement (the "Lease") with Sam's East, Inc. ("Sam's East"), whereby Summit would lease the Premises to Sam's East.[2] Compl. ¶ 5. Sam's East subsequently took possession of the Premises pursuant to the Lease. *See* Third-Party Compl. ¶¶ 5–6. At that point, the concrete and expansion joints (the "Floor Joints") within the Premises had not yet been filled, "as would be typical and customary in such a facility[] to allow for expansion and contraction of the floor's concrete." *Id.* ¶ 6. Sam's East thus obtained a proposal dated July 20, 2022, from TRW Enterprises, Inc. ("TRW") wherein TRW—a Tulsa, Oklahoma-based construction company—offered to perform work on the Floor Joints at the Premises (the

---

[1] Sam's East has attached the original Complaint in this matter to its Third-Party Complaint as Exhibit A. *See* Third Party Compl. Ex. A, ECF No. 21-1; Compl., ECF No. 1. The Court will thus reference both complaints and their accompanying exhibits throughout this opinion. *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011).

[2] The original Lease Agreement identified the "Tenant" as "Sam's West, Inc." Lease Agreement 2. The amendment to the Lease Agreement clarified that such identification was in error and instead specified that the Tenant was intended to be Sam's East, Inc.:

> References to "Tenant" in the Lease as "Sam's West, Inc." are in error and the parties hereto acknowledge and agree that the definition of "Tenant" is as stated in this Agreement. Sam's East, Inc. hereby ratifies the Lease and agrees that it is bound by all terms and conditions of the Lease as of the Lease Date, in the same manner and to the same extent as though the correct tenant name had been reflected therein and as if the original tenant thereto.

Lease Agreement 2. All references to the Lease throughout therefore refer to the amended version.

"TRW Proposal"). *Id.* ¶¶ 2, 6, 8; Compl. ¶ 9. TRW opined that failing to seal the Floor Joints "would be a very expensive situation in the near future." Compl. Ex. B ("Proposal") 2, ECF No. 2-2. TRW therefore proposed to use a "2-part epoxy by sika that's actually harder than concrete" to seal the Floor Joints. *Id.*; Compl. ¶ 10. TRW indicated that it had been "repairing joints for Walmart . . . for over 20 years," and that it utilized this epoxy "in a number of Walmart locations, that has been in 10, 15, to even 20 years." Proposal 2. The TRW Proposal outlined the anticipated "Scope of Work" that TRW would perform. *Id.* Such work included "properly resiz[ing] the [Floor J]oints, excavat[ing] the trash and debris, seal[ing] the [Floor J]oints (with sika epoxy)[,] grind[ing] to a smooth finish and clean[ing] up [the] work area." Proposal 2. Finally, TRW provided the estimated cost of its proposal: $630,000. *Id.*

Sam's East ultimately accepted the TRW Proposal, and the parties entered into a Master Services Agreement[3] ("MSA") under which TRW would perform the proposed work. Third-Party Compl. ¶ 11. A few sections of the MSA are particularly relevant for present purposes. To begin with, Section 1(b) of the MSA defined "Walmart Inc. to include its affiliates, including Sam's East." *Id.* ¶ 12. Next, Section 4 of the MSA required TRW to "perform the Services in a professional and workmanlike manner and in compliance with the terms of this Agreement, any Service Level Agreement, Statement of Work, Work Orders, and applicable industry standards." *Id.* ¶ 13. Also in Section 4, TRW warranted its "Services against defects in workmanship and materials," and agreed to "adhere to [Sam's East's] specifications and policies regarding the performance and delivery of services." *Id.* ¶ 14.

Moving on, Section 9 of the MSA placed an obligation on TRW to "protect, defend, hold harmless and indemnify" Sam's East "from and against any and all lawsuits, claims, demands,

---

[3] Sam's East declined to attach the MSA to its Third-Party Complaint, citing confidentiality concerns. Third-Party Compl. ¶ 11 n.1.

3

actions, liabilities, losses, damages, costs and expenses" asserted against it arising out of any actual or alleged (1) "damage to any property, or any other damage or loss, by whomsoever suffered, resulting in whole or in part from the Services or this Agreement"; and (2) "act, activity, or omission of Contractor or any of its employees, representatives, or agents, including, but not limited to, activities on [Sam's East's] premises." *Id.* ¶ 15. Section 9 also required "TRW to engage counsel to defend Sam's East's interest," and provided that, if TRW failed to do so, Sam's East could "use counsel of its choosing, to be paid for by TRW." *Id.* Lastly, Section 10 of the MSA "required [TRW] to keep in full force and effect certain minimum insurance coverage, including commercial general liability coverage of at least $1 million per occurrence and naming Sam's East as an additional insured." *Id.* ¶ 16.

**B. TRW's Work and the Instant Lawsuit**

In the fall of 2022, TRW performed the proposed work pursuant to the MSA. *Id.* ¶ 10. Shortly after TRW's completion of the work, Sam's East's representatives engaged in internal email discussions expressing concern over the conditions of the floor at the Premises. Compl. ¶ 13. For instance, on November 30, 2022, one of Sam's East's employees, Anthony Chastain, wrote, "[s]ee attached for some of the slab cracks we're seeing. All the control joints have been poured full of concrete instead of caulk. No idea why this was done unless someone was trying to cut corners on a budget." *Id.*; Compl. Ex. C ("Chastain Email") 2, ECF No. 2-3. Chastain continued, "[s]ome of the cracks are still following the control joints, but closer to the middle of the building the cracks start to spiderweb. . . . Likely this is due to all the stress from the perimeter slab pressing against the core of the slab." Chastain Email 2. Chastain also noted that the Premises are "only six months old, and we've only been in [the Premises] for half that time." *Id.* Chastain continued, "I'd expect this to get much worse [with changing temperatures] as many of these

4

cracks didn't appear until the end of summer / beginning of fall . . . . There's the potential . . . this situation will continue to deteriorate." *Id.* Other Sam's East employees voiced similar concerns. *See generally* Compl. Ex. D ("Dec. 2022 Email Chain"), ECF No. 2-4.

Sam's East employees eventually forwarded their concerns to Summit on December 1, 2022, specifically requesting that Summit address the floor issues outlined above. Compl. ¶¶ 15–16. Until this point, Summit was unaware that Sam's East had performed any work on the floors at the Premises. *Id.* at ¶ 16. A Summit representative responded to Sam's East's email on December 2, 2022. *See* Dec. 2022 Email Chain 2–3. In short, Summit explained that (1) the existing conditions and damage to the floors resulted from work performed by Sam's East and its contractors, and (2) Sam's East needed to promptly address the "alarming" structural conditions it caused at the Premises. Compl. ¶ 17; *see* Dec. 2022 Email Chain 2–3. Summit also noted that, while Section 7(d) of the Lease was modified to "allow Sam's [East] to do the control joint filling," Summit "understood [Sam's East] would be using Metzger MM-80 semi-rigid epoxy for the control joint filing," rather than a "2-part epoxy by sika that's actually harder than concrete." Dec. 2022 Email Chain 3. Summit preferred the MM-80 product because it "allows for the normal thermal expansion and contraction of the concrete at the control joints." *Id.* Conversely, a harder product—i.e., the "2-part epoxy" used by Sam's East and TRW—would essentially operate to "glue[] the sections of concrete back together again, defeating the intended stress relief of the control joints," and potentially lead to the sort of cracking that ultimately followed. *Id.*

Since December 2022, Summit and Sam's East have continued communicating about the work performed by Sam's East at the Premises. Compl. ¶ 18. Moreover, Sam's East has apparently performed some mitigative work. *Id.*; *see* Third-Party Compl. ¶ 23 ("Sam's East has suffered covered losses, including but not limited to its hiring of other contractors to make certain

5

improvements to TRW's work."). However, Sam's East has yet to present "[Summit] with a proposal to return the floors to their condition prior to [Sam's East] performing improper and unapproved work on the floors at the Premises." *Id.* Summit thus brought the instant suit on July 28, 2023, seeking damages for breach of contract and indemnification, as well as a declaratory judgment clarifying Sam's East's obligations under the Lease. Compl. ¶¶ 44–60. On August 25, 2023, Sam's East responded by tendering its defense of Summit's lawsuit to TRW and "demand[ing] that TRW fully comply with its obligations under the MSA." Third-Party Compl. ¶ 18. According to Sam's East, "TRW has failed, as required by [Section] 9 of the MSA, to 'immediately take such action as may be necessary or appropriate to protect' Sam's East's interest, and has otherwise failed to meet its obligations under the MSA." *Id.* ¶ 19.

## II. RELEVANT PROCEDURAL HISTORY

Sam's East filed its four-count Third-Party Complaint on December 1, 2023, asserting claims against TRW for contractual and equitable indemnification, contribution, and breach of contract. Third-Party Compl. ¶¶ 21–41. On January 8, 2024, TRW filed the instant Motion to Dismiss and Memorandum in Support thereof. ECF Nos. 31 and 32. Sam's East filed their Memorandum in Opposition to Defendant's Motion to Dismiss on January 22, 2024. ECF No. 35. TRW filed a Reply in Support of its Motion to Dismiss on January 29, 2024. ECF No. 36. Accordingly, this matter is ripe for review.

## III. LEGAL STANDARD

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)).

Dismissals under Rule 12(b)(6) are generally disfavored by the courts because of their res judicata effect. *Fayetteville Invs. v. Com. Builders, Inc.*, 936 F.2d 1462, 1471 (4th Cir. 1991). Federal Rule of Civil Procedure 8 only requires that a complaint set forth "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," "detailed factual allegations" are not required in order to satisfy the pleading requirement of Federal Rule 8(a)(2). *Id.* (citations omitted). "[A] motion to dismiss for failure to state a claim should not be granted unless it appears certain that the plaintiff can prove no set of facts which would support its claim and would entitle it to relief." *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). The plaintiff's well-pleaded allegations are assumed to be true, and the complaint is viewed in the light most favorable to the plaintiff. *Id.* (citations omitted); *see also Martin*, 980 F.2d at 952.

Nevertheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Labels and conclusions," a "formulaic recitation of the elements," and "naked assertions" without factual enhancement are insufficient. *Id.*

## IV. DISCUSSION

TRW raises several arguments in support of its Motion to Dismiss.  First, TRW asserts that Sam's East's Third-Party Complaint should be dismissed in its entirety for being filed in violation of the Court's Rule 16(b) Scheduling Order.  TRW's Mem. Supp. Mot. Dismiss ("Mem. Supp.") 4, ECF No. 32.  TRW then takes aim at the individual counts within the Third-Party Complaint, arguing that (1) Sam's East has failed to plead sufficient facts in support of its breach of contract claim; and (2) Sam's East is not entitled to indemnification or contribution on the present facts.  *See* Mem. Supp. 4–11.  The Court considers these arguments below.

### A.  Sam's East's Third-Party Complaint Was Timely

TRW first argues that Sam's East's Third-Party Complaint is untimely and violative of this Court's Rule 16(b) Scheduling Order.  However, this argument misapprehends the Court's Rule 16(b) Order and ignores other relevant procedural rules.

Federal Rule of Civil Procedure 14 establishes basic guidelines for third-party practice.  *See generally* Fed. R. Civ. P. 14.  Specifically, Rule 14 provides that a third-party plaintiff—such as Sam's East—"must, by motion, obtain the court's leave if it files the third-party complaint more than 14 days after serving its original answer." Fed. R. Civ. P. 14(a)(1).  In other words, a third-party plaintiff may unilaterally file a third-party complaint as a matter of right within fourteen days of serving its original answer.  That said, courts do have the authority to alter the deadlines prescribed by the Federal Rules of Civil Procedure.  *See, e.g.,* Fed. R. Civ. P. 12(a)(4) ("*Unless the court sets a different time*, serving a motion under this rule alters these [time] periods." (emphasis added)); Rule 16(b) Scheduling Order, ECF No. 18 ("The following shall govern the progress of this action in addition to the provisions of the Federal Rules of Civil Procedure as

modified and/or enlarged upon by the Local Rules for this Court. *This Order shall control* if any conflict is perceived between it and either the Federal or Local Rules." (emphasis added)).

Here, Sam's East filed and served its Answer on November 17, 2023. ECF No. 19. Sam's East then filed its Third-Party Complaint fourteen days later, on December 1, 2023. ECF No. 21. Sam's East's Third-Party Complaint therefore complies with the timing requirements set forth in Rule 14. *See* Fed. R. Civ. P. 14(a)(1). TRW's focus on the Court's Rule 16(b) Scheduling Order is misguided. In Paragraph 4 of the Scheduling Order, the Court stated that "[a]ny motions for joinder of additional parties shall be filed no later than **15 days after this order.**" Rule 16(b) Scheduling Order ¶ 4 (emphasis in original). TRW seizes upon this language and argues that Sam's East's Third-Party Complaint is untimely because it was filed twenty-three days after the Court's Rule 16(b) Order. *See* Mem. Supp. 4; TRW's Reply Supp. Mot. Dismiss ("Reply") 2–3, ECF No. 36. However, as Sam's East correctly points out, it "did not file a *motion for joinder*," and did not need to do so. Sam's East's Mem. Opp'n Mot. Dismiss ("Mem. Opp'n") 3, ECF No. 35 (emphasis added). Instead, Sam's East permissibly filed its Third-Party Complaint as a matter of right under Rule 14. *See* Fed. R. Civ. P. 14(a)(1).

In sum, Sam's East filed a Third-Party Complaint rather than a motion for joinder, meaning it needed to comply with Rule 14 rather than Paragraph 4 of this Court's Rule 16(b) Order. Because Sam's East's filing so complied, it is timely and may be considered.

**B. Sam's East Third-Party Complaint Pleads Valid Claims**

Satisfied that Sam's East's Third-Party Complaint is procedurally sound, the Court turns to TRW's more substantive arguments. Namely, TRW argues that Sam's East has failed to sufficiently plead its claims for breach of contract, contractual indemnification, and equitable

9

indemnification and contribution. *See* Mem. Supp. 5–11. The Court will consider each of these arguments following a brief overview of the guiding legal principles.

### 1. Contract Interpretation Under Virginia Law

"Federal court[s] sitting in diversity jurisdiction must apply the choice-of-law rules of the forum state." *United Gov't Sec. Officers of Am. v. Special Operations Grp., Inc.*, 436 F. Supp. 2d 790, 792 (E.D. Va. 2006) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Here, Virginia is the forum, rendering Virginia choice-of-law rules applicable. *See id.* While Virginia law typically honors contractual choice-of-law provisions, it is unclear whether one exists here since only select portions of the MSA have been provided. *See* Third-Party Compl. ¶¶ 11 n.1, 12–16. Moreover, the parties have not explicitly briefed choice of law. *See generally* Mem. Supp.; Mem. Opp'n. Instead, both seem to accept that Virginia law governs this dispute. *See, e.g.,* Mem. Supp. 7–11; Mem. Opp'n 4–7. Because a court need not address choice-of-law issues sua sponte, the Court will assume for the sake of TRW's arguments in this Motion that Virginia law applies. *See Champion Pro Consulting Grp., Inc. v. Impact Sports Football, LLC*, 976 F. Supp. 2d 706, 713 n.2 (M.D.N.C. 2013) (citing *Flying J Inc. v. Comdata Network, Inc.*, 405 F.3d 821, 831 n. 4 (10th Cir. 2005); and citing *In re Korean Air Lines Disaster of Sept. 1, 1983*, 932 F.2d 1475, 1495 (D.C. Cir. 1991) (Mikva, J., dissenting in part)); *cf. Wiener v. AXA Equitable Life Ins. Co.*, 58 F.4th 774, 779–80 (4th Cir. 2023) (choice of law issues are waivable).

Under Virginia law, when the terms in a contract are "clear and unambiguous, the contract is construed according to its plain meaning." *Barber v. VistaRMS, Inc.*, 272 Va. 319, 329 (2006). Further, contracts must be interpreted "in accordance with the intention of the parties gleaned from the words used in the document." *TravCo Ins. Co. v. Ward*, 284 Va. 547, 552 (2012). While courts "must not strain to find ambiguities" in a contract, *Res. Bankshares Corp. v. St. Paul*

*Mercury Ins. Co.*, 407 F.3d 631, 636 (4th Cir. 2005) (collecting Supreme Court of Virginia decisions), contractual provisions may nevertheless be deemed ambiguous where the "language [used] is of doubtful import, admits of being understood in more than one way, admits of two or more meanings, or refers to two or more things at the same time." *Cascades N. Venture Ltd. P'ship v. PRC Inc.*, 249 Va. 574, 579 (1995); *see Medlin & Son Constr. Co., v. Matthews Grp., Inc.*, 2016 WL 7031843, at *7 (Va. Nov. 23, 2016).

    2. Sam's East Has Sufficiently Pleaded Its Breach of Contract Claim (Count II)

TRW urges dismissal of Sam's East breach of contract claim on the grounds that Sam's East has "failed to allege facts sufficient to support a finding that TRW breached the MSA or other agreements with Sam's [East] or that a breach of any such agreements has caused Sam's [East] to suffer damages." Mem. Supp. 10. To that end, TRW argues that the Third-Party Complaint lacks facts "sufficient to show that TRW failed to perform the [Floor Joint work] in a professional or workmanlike manner . . . in violation of the MSA." *Id.* TRW further contends that any judgment rendered against Sam's East in the underlying lawsuit (i.e., potential damages) would necessarily be "based on a finding that [Sam's East] failed to fulfil [sic] its independent obligations owed to Summit under their lease—not because of TRW's breach of the MSA or other agreements between TRW and Sam's." *Id.* at 10.

In response, Sam's East argues that the Third-Party Complaint does in fact meet the necessary pleading standard by alleging, *inter alia*, "(1) that TRW worked on the warehouse floor . . . (2) that TRW performed [such] work under a contractual guarantee and warranty that it would perform its work in a professional and workmanlike manner . . . and (3) that Summit sued Sam's [East], claiming that TRW's work damaged the Premises." Mem. Opp'n 5. Sam's East continues by noting that "if Summit is correct and proves that TRW's work damaged the Premises,

11

it will be because TRW's work contained defects in workmanship, materials, or both." *Id.* at 5–6. Sam's East also notes that its Third-Party Complaint "refers to and includes as an exhibit Summit's Complaint . . . which provides even more textual and photographic content for TRW's alleged breaches." *Id.* at 6. Sam's East concludes by arguing that the quality of TRW's work is "directly at issue because a finding that TRW's work was improper will be a necessary component of any monetary or declaratory relief for Summit." *Id.*

In Virginia, the elements of a breach of contract claim are: (1) a legally enforceable obligation of a defendant to a plaintiff, (2) the defendant's violation or breach of that obligation, and (3) resulting injury or harm to the plaintiff. *Filak v. George*, 267 Va. 612, 619 (2004). With these elements in mind, the Court finds that Sam's East has alleged "sufficient factual matter, accepted as true," to support its breach of contract claim against TRW. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To begin, Sam's East has alleged the existence of the MSA, which establishes certain legally enforceable obligations on behalf of both Sam's East and TRW. *See* Third-Party Compl. ¶¶ 11–16, 19. The existence of such obligations as a general matter appears to be undisputed. *See generally* Mem. Supp; Mem. Opp'n.

Next, Sam's East has also sufficiently alleged that TRW breached the MSA's provisions. To be sure, the Third-Party Complaint *itself* does not explicitly allege that TRW's work contained defects in workmanship and/or materials (i.e., that TRW breached its obligations under the MSA). However, the Third-Party Complaint attaches and incorporates the underlying Complaint. *See* Third-Party Compl. ¶¶ 5, 17. The Complaint, in turn, alleges that the Floor Joint work constituted "negligent or willful misconduct," insofar as the materials used and work completed "significantly damaged" the floors of the Premises. Compl. ¶¶ 23, 27; *see* Compl. ¶¶ 22–24, 27, 36–37, 48–50

(alleging that the Floor Joint work was both unapproved *and* improper). The Complaint also incorporates documents that further flesh out these allegations. *See, e.g.,* December 2022 Email Chain 3 ("[TRW] used a '2-part epoxy by sika' . . . [that] essentially glued the sections of concrete back together . . . [which] caused random cracking of the floor slabs. . . . [TRW also] damaged the surface of the concrete at the locations where [it] used the improper product by grinding the floor across the joint."). Viewed in the light most favorable to Sam's East, these incorporated allegations indicate that TRW's work breached the MSA because such work contained "defects in workmanship and[/or] materials." Third-Party Compl. ¶¶ 14, 30.

Finally, Sam's East has sufficiently alleged that TRW's breach resulted in harm. Specifically, Sam's East has averred that, if it is found liable to Summit and subsequently incurs damages, such damages ultimately derive from TRW's breach of the MSA. *See* Third-Party Compl. ¶¶ 17–18, 31–32. Such "if, then" allegations are typical of—and sufficient to support—third-party complaints. *See, e.g.*, *E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, 688 F. Supp. 2d 443, 462–63 (E.D. Va. 2009) ("[I]t is well-settled that '[a] breach of contract claim may form the basis for impleader of a third-party defendant, so long as it is sufficiently derivative of or dependent upon the main claim.'") (quoting *Int'l Paving Sys. v. Van-Tulco, Inc.*, 866 F. Supp. 682, 687 (E.D.N.Y. 1994)); *Watergate Landmark Condo. Unit Owners' Ass'n v. Wiss, Janey, Elstner Assocs., Inc.*, 117 F.R.D. 576, 577 (E.D. Va. 1987) ("[A] third party complaint is appropriate . . . where the third-party defendant would be . . . derivatively liable to the defendant [if] the defendant is held liable to the plaintiff.").

TRW's arguments to the contrary on this issue are all unavailing. For instance, TRW describes Sam's East's allegations as "merely speculative possibilities, which cannot as a matter of law form the basis for a breach of contract claim." Reply 4. In support of this position, TRW

13

specifically takes issue with the "if, then" styling of Sam's East's allegations. *Id.* 3–4. However, TRW's argument ignores the very purpose of third-party practice. Indeed, third-party claims are *specifically* viable where a proposed third-party plaintiff "says, in effect, '*If* I am liable to plaintiff, *then* my liability is only technical or secondary or partial, and the third party defendant is derivatively liable and must reimburse me for all or part . . . of anything I must pay plaintiff." *Watergate*, 117 F.R.D. at 577; *see E.I. DuPont de Nemours & Co.*, 688 F. Supp. 2d at 462–63. It would undermine the purpose of Rule 14 to require anything more from Sam's East at this juncture.

TRW also argues that "[a]ny judgment rendered against Sam's [East] in favor of Summit would be based on a finding that [Sam's East] failed to fulfil [sic] obligations owed to Summit under their lease—not because of TRW's breach of the MSA or other agreements between TRW and Sam's [East]." Mem. Supp. 10. This argument misconstrues the allegations within the Complaint. Summit has alleged that the Floor Joint work was both unapproved *and* improperly done. *See* Compl. ¶¶ 22–24, 27–28, 36–37, 48–50. And in fact, Summit must necessarily allege that the work was *substantively* improper to establish that it is entitled to any damages. Put differently, Summit would be unable to establish that any damages resulted from Sam's East purported breach (i.e., failing to obtain prior approval for the work) if TRW's work was proper and did not damage the Premises. It is thus incorrect to say that any judgment against Sam's East would be based *strictly* on a finding that Sam's East breached the Lease by failing to obtain prior approval from Summit.

At bottom, Sam's East has sufficiently pleaded its breach of contract claim against TRW. TRW's arguments to the contrary either misconstrue the allegations within the Complaint and Third-Party Complaint or are essentially tantamount to critiques of Rule 14. The Court will therefore deny TRW's Motion to Dismiss as to Count II of the Third-Party Complaint.

### 3. Sam's East Has Sufficiently Pleaded Its Contractual Indemnification Claim (Count I)

TRW also seeks dismissal of Sam's East contractual indemnification claim based on arguments that (1) the MSA does not provide for indemnification under these circumstances, and (2) any contractual indemnification claim has yet to accrue. Neither argument is a winner.

#### a. The MSA Provides for Indemnification under These Circumstances

The Court begins with TRW's first argument—that the MSA does not provide for indemnification under these circumstances. While the MSA was not provided in its entirety, Sam's East has provided the portion most relevant for present purposes: Section 9. *See* Third-Party Compl. ¶ 15. Among other things, Section 9 of the MSA obligates TRW to protect, defend, and indemnify Sam's East "against any and all lawsuits, claims, demands, actions, liabilities, losses, [and] damages" asserted against it, "arising out of *any actual or alleged* . . . damage to any property, or other damage or loss, resulting *in whole or in part from* the Services or this Agreement." *Id.* (emphasis added).

In this case, Summit has alleged that Sam's East breached the Lease by both (1) failing to obtain prior approval for the work at the Premises, *and* (2) performing improper work on the Floor Joints and damaging the Premises in the process. Compl. ¶ 19 ("This case centers on [Sam's East's] failure to obtain the required advance approval . . . for work performed on the Floor Joints at the Premises. In addition, the work performed by [Sam's East] was improper . . . and has caused significant damage to Plaintiffs and . . . the Premises."). These allegations reveal that Summit's lawsuit against Sam's East plainly "aris[es] out of . . . actual or alleged . . . damage to any property, or any other damage or loss . . . resulting *in whole or in part from* the Services or the [MSA]." Third-Party Compl. ¶ 15. The instant lawsuit therefore falls squarely within the scope of the MSA's indemnification provisions.

15

TRW attempts to avoid this conclusion by ignoring or otherwise obfuscating this crucial point. For instance, TRW highlights the portions of the Complaint wherein Summit alleges that "its damages and losses would have been avoided if Sam's [East] had fulfilled its contractual obligations and shared TRW's proposal thereby affording Summit the opportunity to deny the use of Sika Epoxy." Mem. Supp. 6. Such allegations may well be true. However, that does not excuse TRW from its *independent* contractual obligation to indemnify Sam's East against losses resulting "in whole or in part" from TRW's work. Third-Party Compl ¶ 15. That is to say, Sam's East's alleged breach of the Lease does not excuse TRW from its obligations to Sam's East under the MSA. Rather, TRW remains bound by the obligations therein. And as outlined above, Sam's East has sufficiently alleged that Summit's damages are attributable (at least in part) to TRW's work on the Floor Joints, thereby triggering TRW's indemnification obligations.

### b. Sam's East Has Properly Asserted Its Contractual Indemnification Claim

TRW next argues that the indemnification provisions of the MSA are inapplicable because any indemnification claim has yet to accrue. This argument fares no better than the last.

Under § 8.01-249(5) of the Virginia Code, a right of action for indemnification accrues "when the . . . indemnitee has paid or discharged" its obligation. VA. CODE ANN. § 8.01-249(5). Accordingly, a claim for indemnification "does not accrue until the indemnitee has suffered a loss." *Lone Mountain Processing, Inc. v. Bowser Morner, Inc.*, 94 F. App'x 149, 157–58 (4th Cir. 2004); *see First Va. Bank-Colonial v. Baker*, 225 Va. 72, 77 (1983) ("[A] contract of indemnity is a bilateral agreement between an indemnitor and an indemnitee in which the indemnitor promises to reimburse his indemnitee for loss suffered or to save him harmless from liability."). In the indemnity context, a party typically suffers an actionable "loss" when it pays out money to a third party. *See Kohl's Dep't Stores, Inc. v. Target Stores, Inc.*, 290 F. Supp. 2d 674, 689 (E.D. Va.

2003); *Nationwide Mut. Ins. Co. v. Jewel Tea Co.*, 202 Va. 527, 532 (1961); *Summit Invs. II v. Sam's E., Inc.*, 2024 WL 1223541, at *12 (E.D. Va. Mar. 21, 2024).

Notably, however, § 8.01-249(5) includes a specific carve-out for the sort of third-party claim at issue here: "A third-party claim permitted by subsection A of § 8.01-281 and the Rules of Court may be asserted *before* such cause of action is deemed to accrue hereunder." VA. CODE ANN. § 249(5) (emphasis added). In turn, § 8.01.281(A) provides as follows:

> A party asserting . . . a . . . third-party claim . . . may plead alternative facts and theories of recovery against alternative parties, provided that such claims . . . so joined arise out of the same transaction or occurrence. Such . . . third-party claim may be for contribution, indemnity . . . or contract, express or implied; it may be based on future potential liability, and it shall be no defense thereto that the party asserting such . . . third-party claim has made no payment or otherwise discharged any claim as to him arising out of the transaction or occurrence.

VA. CODE ANN. § 8.01-281(A). The import of this provision is that a "defendant may bring a [third-party] claim for indemnification or contribution before [it] is held liable or required to pay a claim," i.e., before such a claim would typically have accrued. *Graham v. Cmty. Mgmt. Corp.*, 294 Va. 222, 228 (2017); *see Nationwide Mut. Fire Ins. Co. v. Erie Ins. Exch.*, 297 Va. 455, 461 n.1 (2019) ("A cause of action for equitable contribution accrues when the party seeking contribution pays or discharges the . . . obligation, *unless* that party brings a 'third-party claim permitted by subsection A of § 8.01-281 and the Rules of Court.'") (Kelsey, J., dissenting) (quoting VA. CODE ANN. § 8.01-249(5)) (emphasis added).

In view of the above, the Court finds that Sam's East's contractual indemnification claim has been properly asserted. TRW's primary argument to the contrary—that Sam's East has not yet paid out money to a third-party for which it would be entitled to indemnification, *see* Mem. Supp. 7–8—wholly ignores both the latter half of § 8.01-249(5) as well as § 8.01.281(A). Read together, these provisions clearly exempt third-party claims from the accrual rules typically

applicable to indemnification actions. Accordingly, § 8.01-249(5) is no bar to the third-party contractual indemnification claim brought by Sam's East.[4] *See* VA. CODE ANN. § 8.01-281(A) (noting that third-party indemnification claims are proper even where the indemnitee has not yet "made . . . payment or otherwise discharged any claim as to him" arising out of the relevant transaction or occurrence); *Graham*, 294 Va. 222, 228, 228 n.3.

### c. Contractual Indemnification Summary

To summarize, Sam's East has sufficiently alleged both that (1) the indemnification provisions of the MSA are applicable under these circumstances, and (2) its indemnification claim is permissible to assert at this time. The Court will therefore deny TRW's Motion to Dismiss as to Count I of the Third-Party Complaint.

### 4. Sam's East Has Sufficiently Pleaded Its Equitable Indemnification and Contribution Claims (Counts III and IV)

TRW last seeks dismissal of Sam's East's equitable indemnification and contribution claims, contending that Sam's East has failed to "plead a factual basis to support the allegations that it has paid out any money to a third party." Mem. Supp. 11. As this language reveals, TRW's

---

[4] In any event, Sam's East's allegations also plainly establish that it has already suffered a loss sufficient to otherwise trigger TRW's indemnification obligations under the MSA. Specifically, Sam's East has alleged that it has suffered losses "including but not limited to its hiring of other contractors to make certain improvements to TRW's [purportedly improper] work." Third-Party Compl. ¶ 23; *see* Third-Party Compl. ¶¶ 17, 31; Compl. ¶¶ 22–24, 27, 36–37, 40, 48–50. Sam's East has therefore made the quintessential indemnification allegation—that it has paid out money to a third party. *See Kohl's Dep't Stores, Inc.*, 290 F. Supp. at 689 (noting that § 8.01-249(5) codified the common law rule that "an action for indemnification [does] not accrue until the plaintiff suffer[s] an injury, *i.e., . . . pa[ys] out money to a third party*") (emphasis added); *Summit Invs. II*, 2024 WL 1223541, at *12 (same).

TRW's alternative argument on this point—that Sam's East's allegations fail to demonstrate "that any so called 'improvements' were related to TRW's breach of the MSA," Mem. Supp. 7 n.2; *see* Reply 6—constitutes an impermissible attempt to move the goalposts at the 12(b)(6) stage. Sam's East has alleged, in relevant part, that (1) Summit has sued Sam's East alleging that TRW's work caused the Premises to suffer damage, Third-Party Compl. ¶ 17; and (2) if the trier of fact finds that Sam's East is liable to Summit, it will be "because TRW failed to perform the [Floor Joint work] in a professional or workmanlike manner, or . . . in compliance with applicable agreements or injury standards, or because TRW's work contained defects in workmanship, materials, or both in contravention of its warranty." Third-Party Compl. ¶ 31. Sam's East has also incorporated Summit's Complaint, which expressly alleges that TRW's work was improperly done. *See* Compl. ¶¶ 22–24, 27, 36–37, 40, 48–50. Taken together and viewed in the light most favorable to Sam's East, these allegations are sufficient to establish that the remedial work for which Sam's East has incurred repair costs relates to the allegedly improper work done by TRW.

argument for dismissal of these claims is the same as its argument for dismissal of Sam's East's contractual indemnification claim discussed above. *See* Reply 6–7 ("Sam's [East] has failed to plead facts sufficient to show that it has suffered any loss upon which to premise claims for contractual and/or equitable indemnification or contribution. . . . [Therefore,] this Court should dismiss Counts I, II, and III of the Third-Party Complaint."). For the same reasons outlined above, *see supra* Part IV.B.3.b, the Court rejects this argument and will allow Sam's East's equitable indemnification and contribution claims to proceed.[5]

## V. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss (ECF No. 31) will be denied.

An appropriate Order shall issue.

/s/ RCY
Roderick C. Young
United States District Judge

Richmond, Virginia
Date: June 7, 2024

---

[5] To further elaborate, § 8.01-249(5) governs the accrual of both contractual *and* equitable indemnification/contribution claims. *See, e.g., Nationwide Mut. Fire Ins. Co.*, 297 Va. 455, 461 n.1; *Canal Ins. Co. v. Lebanon Ins. Agency, Inc.*, 504 F. Supp. 2d 113, 117 n.4 (W.D. Va. 2007). Therefore, Sam's East's equitable indemnification and contribution claims survive for the same reason as its contractual indemnification claim—§ 8.01-249(5), as modified by § 8.01-281(A), permits third-party indemnification or contribution claims even where "the party asserting such . . . third-party claim has made no payment or otherwise discharged any claim as to him arising out of the transaction or occurrence." VA. CODE ANN. § 8.01-281(A).

Regardless, the Court also disagrees with TRW's characterization of Sam's East's allegations, insofar as Sam's East's allegations *do* establish that it has suffered a loss sufficient to trigger TRW's indemnification obligations, § 8.01-281(A) notwithstanding. Third-Party Compl. ¶ 23 (alleging that Sam's East has suffered losses "including but not limited to its hiring of other contractors to make certain improvements to TRW's [purportedly improper] work"); *see* Third-Party Compl. ¶¶ 17, 31; Compl. ¶¶ 22–24, 27, 36–37, 40, 48–50. These allegations demonstrate that Sam's East has in fact paid out money to a third party, such as to trigger TRW's indemnification obligations under normal circumstances. *See* VA. CODE ANN. § 8.01-249(5); *Kohl's Dep't Stores, Inc.*, 290 F. Supp. at 689 ("[A]n action for indemnification [does] not [typically] accrue until the plaintiff suffer[s] an injury, *i.e., ... pa[ys] out money to a third party*.") (emphasis added); *Summit Invs. II*, 2024 WL 1223541, at *12 (same).